[Crim. No. 5074. Fifth Dist. May 14, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
SAMMY SANCHEZ, Defendant and Appellant.

■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■

■■■■■■

COUNSEL

Roderick P. Bushnell, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, James T. McNally and Lisa Lewis Dubois, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

CONKLIN, J.*—On March 20, 1980, an information was filed in the Fresno County Superior Court charging appellant, Sammy Sanchez, with two counts of forcible rape, a violation of Penal Code section 261, subdivisions (2) and (3) (counts I and II), and with one count of oral copulation, a violation of Penal Code section 288a, subdivision (c) (count III). It was further alleged that in the commission of each offense, appellant inflicted great bodily injury within the meaning of Penal Code section 12022.7. A prior felony conviction was also alleged. Appellant admitted the felony conviction allegation prior to trial.

Appellant filed a pretrial motion to suppress a lineup identification of appellant made by the victim. The motion was denied.

The jury returned a verdict finding appellant guilty of each offense and further finding that appellant inflicted great bodily injury during the commission of each offense.

Appellant was sentenced to state prison for a total of 18 years. He received the upper base term of eight years for his count I conviction plus an additional three years for the great bodily injury finding. He received an additional three years for the prior felony conviction plus an

*Assigned by the Chairperson of the Judicial Council.

additional four years to be served consecutively for his counts II and III convictions.

Appellant filed a timely notice of appeal.

FACTS

Seventeen-year-old Stella was out with friends on the evening of Friday, November 30, 1979. She had been drinking beer with her friends. Around midnight her friends dropped her off in Fresno. As Stella started walking towards her home, she noticed another friend of hers, Raymond, standing by a telephone booth. Raymond asked her if she wanted a ride home and she said yes. Stella got in the car and they waited for a friend of Raymond's to come out of the store.

Raymond's friend came out and entered the car. Raymond's friend drove. In court, Stella identified the driver of the car as appellant, Sammy Sanchez.

Raymond asked Stella if she wanted to go to a party. Stella replied that she did. When they arrived at the party most of the people had already left, so they decided to head back to town. Raymond left the vehicle when they returned to Fresno.

After Raymond was dropped off, Stella asked appellant to take her home. Appellant said it was too early and asked Stella to stay out with him. Stella said she would. The two drove around. Appellant asked Stella for her phone number. Unable to find a piece of paper, she wrote her phone number on appellant's right forearm.

Appellant told Stella he was new in town and wanted to know where Fresno State was located. Stella gave him directions, but appellant did not follow them. He headed away from the college. Stella told him to turn back because he was going the wrong way. He did not answer her. She told him that she wanted to go home, but he just kept driving towards the freeway.

After about 15 minutes, appellant pulled over into a field and stopped the car. He turned to Stella and said, "You know what I want and you're going to give it to me." He started to pull her clothes off. She struggled, pushing him away. She attempted to climb out of the car, but appellant grabbed her by the leg and pulled her back in.

Stella began screaming. Appellant grabbed her by the throat and started choking her. Appellant started slapping her face with an open hand and fist. He still had her by the throat, and she felt herself passing out. She gasped for air, screamed again, and finally told appellant that she would give him what he wanted. Appellant tore all of her clothes off and committed an act of intercourse with her. Appellant kept saying, "I'm gonna kill you."

Afterward, appellant drove for a short while and then stopped the car on the side of the road near a field of grape vines. He told Stella he wanted a blow job. She cried. He started hitting her again, telling her that he had killed before and he was going to kill her. He pulled down his pants, grabbed her by the hair, and forced her to orally copulate him. During the act, Stella bit him. Appellant started beating Stella badly so she let him go.

Appellant then threw Stella to the side of the car and said he was going to kill her. He pulled out a belt and wrapped it around her neck. He opened the door and attempted to drag her from the car. She fought vigorously, pulling at the belt. Finally appellant said, "You won" and closed the door. He started the car and drove off.

Stella continued to cry and scream as they were driving away. Appellant told her that if she would not be quiet, he was going to rape her. He then pulled off the road by another field and forced Stella to have intercourse with him again.

Appellant allowed Stella to put her clothes back on during the ride back to Fresno. He told her that he was mad at her because she had scratched his face. Stella looked at him and saw scratches on the right side of his cheek.

After returning to Fresno, appellant let Stella out of the car. He then told her that if she reported the incident, she would be killed. Stella estimated that she was in the car with appellant for about three to four hours. After getting out of the car, Stella ran to her girl friend's apartment. They went to the nearest telephone booth and called the police. Stella's friend then drove her to the police station.

At the station, Stella talked with Patrolman Patrick Smith. He met her at approximately 8:30 a.m. on December 1, 1979. She had numerous bruises about the face and "looked like she had been beaten up

fairly well." She still had a slight odor of alcohol on her breath. Stella was able to give the officer a description of her assailant. She described the suspect vehicle as a 1971 or 1972 beige station wagon with wood paneling on the sides.

The police took Stella to the Valley V Medical Center. She was treated by Dr. Richard Chandler. She had multiple superficial abrasions and lacerations, primarily on her back and neck. She had one long scratch from her mid-neck stretching down diagonally across her right scapula and multiple bruises and numerous small cuts on her neck. None of the cuts or scratches required suturing. She also had a serious swelling and bruising of her right eye and a markedly swollen left cheek. Dr. Chandler found sperm in the vaginal wall of the victim which was consistent with intercourse occurring at 2 to 3 a.m. the previous morning.

Appellant's brother, Robert Sanchez, owned a 1973 gold station wagon with wood paneling on the sides. Initially, Robert Sanchez was arrested for the instant offense, but he was subsequently discharged.

Linda Sanchez, the estranged wife of Robert Sanchez, testified that on Saturday, a couple of days before her husband's arrest, appellant came to the Robert Sanchez residence. She saw him outside the house at 6:45 a.m. and he had scratch marks on his face. She testified that her husband had given appellant permission on Friday to use the station wagon. The car was not outside their house when Linda went to bed Friday night, but was there Saturday morning. December 1, 1979, was a Saturday.

Appellant testified in his own behalf and provided an alibi defense. He claimed to have driven to Monterey on November 30, 1979, to pick up baking equipment for his brother's wedding. He said he did not return to Fresno until December 2, 1979.

I

■ Appellant's first contention on appeal is that there was insufficient evidence in support of appellant's rape and oral copulation convictions. Appellant contends the testimony of Stella, the victim, is inherently improbable and that appellant provided a solid alibi defense. Appellant's contention is clearly without merit.

The basic principle which governs judicial review of a criminal conviction challenged as lacking evidentiary support has been succinctly stated in *People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738]: "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is · reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."

Stella's testimony was corroborated by her description of the assailant matching appellant's; three successful identifications with no misidentifications; and incontrovertible evidence of a recent act of intercourse and having suffered a vicious beating. Reviewing this record as a whole indicates that there was more than substantial evidence to support appellant's convictions beyond a reasonable doubt.

## II

■ Appellant contends that he cannot be sentenced for two separate counts of rape when both rapes occurred on the same evening, involved the same victim, and constituted one single sexual offense. Thus, appellant argues sentencing appellant on two counts of rape violates Penal Code section 654, prohibiting multiple punishment.

Appellant concedes that two separate penetrations occurred. However, appellant argues, the victim was the same and the penetrations occurred in both cases while the victim was in the "same location," to wit: the car.[1] Citing Penal Code section 263 which provides that "The essential guilt of rape consists in the outrage to the person and feelings of the victim of the rape . . . ." appellant states, "it would appear that in the instant case that the victim would not feel separate outrage because there was [*sic*] two separate penetrations." Appellant's contention is meritless and has been disposed of numerous times following the California Supreme Court opinion in *People* v. *Perez* (1979) 23 Cal.3d 545 [153 Cal.Rptr. 40, 591 P.2d 63, 3 A.L.R.4th 339]. *Perez* held that Penal Code section 654 does not preclude consecutive sentences of defendant for multiple sex offenses. (*Id.*, at pp. 553-554.) The Supreme Court held: "[W]e find no basis to depart from the cases relied on by

---

[1]Appellant places little emphasis on the fact that while the acts all took place in the *vehicle*, the vehicle was in fact located in *different rural areas* during each separate act.

the People and no basis under those cases for applying section 654 in this case. None of the sex offenses was committed as a means of committing any other, none facilitated commission of any other, and none was incidental to the commission of any other. We therefore conclude that section 654 does not preclude punishment for each of the sex offenses committed by the defendant." (*Ibid.*)

The court also noted that "A defendant who attempts to achieve sexual gratification by committing a number of base criminal acts on his victim is substantially more culpable than a defendant who commits only one such act." (*Id.*, at p. 553.)

This court in *People* v. *Madden* (1981) 116 Cal.App.3d 212, 218 [171 Cal.Rptr. 897], following the rationale of *People* v. *Perez, supra*, 23 Cal.3d 545, and *People* v. *Clem* (1980) 104 Cal.App.3d 337 [163 Cal.Rptr. 553], has specifically held that "Multiple sex acts cannot be held to be continuous conduct on a theory of there being but one act of sexual abuse." Thus, appellant's contention cannot stand. There was no violation of Penal Code section 654 in the instant case.

### III

Appellant's next contention on appeal is that the victim's viewing of him at the courthouse on February 25, 1980, tainted the subsequent live lineup identification so as to render this lineup evidence inadmissible.

The general rules of law governing the admissibility of pretrial identification procedures are well established. The California courts have adopted the standards as set forth by the United States Supreme Court. Unnecessarily suggestive identification procedures, regardless of when or where they are conducted, violate a suspect's right to due process. (*In re Hall* (1981) 30 Cal.3d 408, 432 [179 Cal.Rptr. 223, 637 P.2d 690]; *Stovall* v. *Denno* (1967) 388 U.S. 293, 299-302 [18 L.Ed.2d 1199, 1204-1206, 87 S.Ct. 1967]; *People* v. *Caruso* (1968) 68 Cal.2d 183, 188 [65 Cal.Rptr. 336, 436 P.2d 336].) The facts and circumstances of the identification must be assessed to determine whether they were "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (*Simmons* v. *United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253, 88 S.Ct.

967]; *People* v. *Blair* (1979) 25 Cal.3d 640, 659 [159 Cal.Rptr. 818, 602 P.2d 738].)

"It is the application of this principle—variously styled the 'independent source' or 'independent origin' rule—to the particular case before us which is our present concern. As we understand the *Wade* and *Gilbert* decisions, the admission of an in-court identification which has a source or origin 'independent' of the illegal pretrial confrontation is not error, whereas the admission of an in-court identification which is not shown to be 'independent' of such a confrontation is error of constitutional dimension and compels reversal unless shown to be 'harmless beyond a reasonable doubt' under the standard of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]. (*People* v. *Fowler, supra*, 1 Cal.3d 335, 341, 350 [82 Cal.Rptr. 363, 461 P.2d 643].)" (*People* v. *Martin* (1970) 2 Cal.3d 822, 831 [87 Cal.Rptr. 709, 471 P.2d 29].)

When the question arises whether an identification made has been impermissibly tainted by a prior illegal confrontation or identification, the test to be applied is as follows: "'[W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" (*Wong Sun* v. *United States* (1963) 371 U.S. 471, 488 [9 L.Ed.2d 441, 455, 83 S.Ct. 407]; also quoted in *People* v. *Martin, supra*, 2 Cal.3d 822, 831, and *People* v. *Nation* (1980) 26 Cal.3d 169, 181 [161 Cal.Rptr. 299, 604 P.2d 1051].)

The factors to be considered in applying the above test were succinctly stated in *United States* v. *Wade* (1967) 388 U.S. 218, 241 [18 L.Ed.2d 1149, 1165, 87 S.Ct. 1926]: (1) The prior opportunity to observe the alleged criminal act; (2) the existence of any discrepancy between the prelineup description and the defendant's actual description; (3) any identification prior to lineup of another person; (4) the identification by picture of the defendant prior to the lineup; (5) a failure to identify the defendant on a prior occasion; (6) the lapse of time between the alleged act and the lineup identification; (7) any facts disclosed concerning the conduct of the lineup.

■ To summarize, the admission into evidence of a lineup identification which has as a source an origin independent of the prior illegal

procedure is not error.[2] If a defense counsel makes the appropriate objection, the burden is then on the prosecution to establish by clear and convincing evidence that the lineup identification was purged of the taint of the prior illegality. (*People* v. *Nation, supra*, 26 Cal.3d at p. 181.)

 Applying the factors as set forth in *United States* v. *Wade, supra*, 388 U.S. 218, to this case, it becomes clear that the prosecution established by clear and convincing evidence that the lineup identification was purged of any possible "taint" resulting from the fact that the victim in this case had an opportunity to view appellant at the scheduled February 25th preliminary hearing and that the lineup identification was independent of that earlier viewing.

Stella's prior opportunity to observe the defendant before, after and in the perpetration of the criminal acts involved a time span of three to four hours; there was substantial congruity between her prelineup description and appellant's actual description; at no time did she ever identify anyone other than appellant as the assailant and she declined to identify anyone out of a photo lineup that did *not* contain a photograph of appellant; she correctly selected appellant from two properly structured photo lineups and further qualified the selection by saying that appellant "looked younger" in a photograph that was approximately five years old; at no time did she ever fail to identify appellant; the three photo lineups (the lineup without appellant's picture, the older photo of appellant and the current photo of appellant) took place within one, six and eight weeks respectively, and the live lineup was conducted ninety-three days after the offense; and finally, all of the prepared lineups were properly conducted and no objection was interposed at trial as to their structure. Admission of the lineup identification of appellant was therefore not error.[3]

---

[2] We do not mean to imply that *all* viewings by a witness *necessarily* have an "impermissively suggestive context" so as to constitute an illegal procedure.

[3] Moreover, even if the admission of this lineup identification were error, it was certainly harmless beyond a reasonable doubt under the standard of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People* v. *Martin, supra*, 2 Cal.3d 822, 831. This lineup identification did not provide the only means of connecting appellant with the alleged crimes. As mentioned above, Stella provided an accurate description of her attacker and subsequently made two photographic identifications which were admitted into evidence without objection.

## IV

■ Appellant's next contention on appeal is that there was insufficient evidence to support the jury's finding that the victim suffered great bodily injury pursuant to Penal Code section 12022.7.

In *People* v. *Caudillo* (1978) 21 Cal.3d 562 [146 Cal.Rptr. 859, 580 P.2d 274], the Supreme Court held that the enhanced sentences provided by Penal Code section 12022.7 are intended to apply where a significant physical injury is inflicted in the commission of a felony, and that injuries "that can logically only be described as constituting transitory and short-lived bodily distress" are outside the intended scope of the statute. (*Id.*, at p. 588.) The court ruled out emotional and psychological injuries, and further found that other injuries to the victim of the assaults in that case were "superficial, with no indication of any permanent, protracted or visible disfigurement." (*Ibid.*)

Penal Code section 12022.7 was amended in 1977 by striking out the detailed definition of "great bodily injury" found in the 1976 version of the statute.[4] The new statute substituted the following definition: "As used in this section great bodily injury means a significant or substantial physical injury." The court in *Caudillo* stated that the 1977 amendment was not intended to lessen the magnitude of bodily injury required by the 1976 statute, but was designed to preclude the possibility that the 1976 version might be construed as all-inclusive, leaving no latitude to the trier of fact to find a bodily injury of equal magnitude to the categories specified in the 1976 detailed definition but not coming literally within any category set forth therein. (*Id.*, 21 Cal.3d at p. 582; *People* v. *Jaramillo* (1979) 98 Cal.App.3d 830, 836 [159 Cal.Rptr. 771].)

Appellant contends the victim in this case suffered physical injuries less severe than the physical injuries suffered by the victim in *Caudillo*.

---

[4]The 1976 version contained the following definition: "As used in this section 'great bodily injury' means a serious impairment of physical condition, which includes any of the following:
"(a) Prolonged loss of consciousness.
"(b) Severe concussion.
"(c) Protracted loss of any bodily member or organ.
"(d) Protracted impairment of function of any bodily member or organ or bone.
"(e) A wound or wounds requiring extensive suturing.
"(f) Serious disfigurement.
"(g) Severe physical pain inflicted by torture."

Appellant is in error. The physical injuries suffered by the victim in *Caudillo* consisted of two superficial knife cuts on the victim's neck. In contrast, the victim in the instant case suffered *multiple* abrasions and lacerations. She had one long scratch diagonally across her back and numerous bruises and small lacerations on her neck. She had a serious swelling and bruising of her right eye and markedly swollen left cheek.

Penal Code section 12022.7 and the *Caudillo* opinion do not provide definitionally precise guidelines. As stated in *People v. Jaramillo, supra*, 98 Cal.App.3d 830, 836, "A fine line can divide an injury from being significant or substantial from an injury that does not quite meet the description." A careful reading of the cases following *Caudillo* does not provide much assistance on the issue of what constitutes significant or substantial physical injury.

Examples of injuries sufficient to constitute "great bodily injury" include a broken jaw (*People v. Johnson* (1980) 104 Cal.App.3d 598 [164 Cal.Rptr. 69]), a broken hand (*People v. Kent* (1979) 96 Cal. App.3d 130 [158 Cal.Rptr. 35]), or swollen and discolored portions of the body causing pain when lightly touched, injuries sustained when a child was "caned" by her mother (*People v. Jaramillo, supra*, 98 Cal. App.3d 830). In a forcible rape case, the tearing and bleeding of the hymen, where the victim was a virgin, accompanied by pain and feeling "tortured" has been found sufficient to sustain a finding under Penal Code section 12022.7, post-*Caudillo*. (*People v. Williams* (1981) 115 Cal.App.3d 446 [171 Cal.Rptr. 401].)

On the other hand, slight reddening of the skin as a result of choking is *not* sufficient even though it would support a finding of *force likely to produce* great bodily injury. (*People v. Covino* (1980) 100 Cal.App. 3d 660 [161 Cal.Rptr. 155].)

Although the Supreme Court held in *Caudillo* that the quantum of injury to support a finding of "great bodily injury" was not *reduced* by the enactment of the 1977 amendment to Penal Code section 12022.7, at least two cases since *Caudillo* indicate it has been *changed.* Injuries, including such as those in the instant case, that arguably would not have qualified under former Penal Code section 12022.7 (*ante*, fn. 4), may now support a finding of "great bodily injury" by the trier of fact. (*People v. Jaramillo, supra*, 98 Cal.App.3d 830; *People v. Williams, supra*, 115 Cal.App.3d 446.)

The closest case to the case at bar is *People* v. *Jaramillo, supra*, 98 Cal.App.3d 830. In *Jaramillo* the victim, a six-year-old child, suffered multiple contusions which caused painful swelling and left severe discoloration over various portions of her body. The injuries were visible the day after their infliction. In addition there was evidence that the child suffered pain as a result of her injuries. The court held these facts sufficient to sustain a finding of "great bodily injury." (*Id.*, at p. 836.) In reaching this decision the court stated that, "Clearly it is the trier of fact that must in most situations make the determination. Here, while the issue might be close it appears that there were sufficient facts upon which the court could base its finding of great bodily injury and such a finding therefor will not be disturbed on appeal." (*Ibid.*)

In this case the jury was shown photographs of the injuries to Stella. The photographs clearly show serious contusions, lacerations and abrasions establishing that she was brutalized by appellant. In addition there was uncontradicted evidence in the form of an expert opinion from a medical doctor that Stella suffered a "significant injury from a medical standpoint."

This court finds there was sufficient evidence to support the jury's finding that appellant inflicted great bodily injury upon the victim.

## V

Appellant contends the trial court erred by improperly granting the prosecution's motion for a continuance to produce a rebuttal witness.

Outside the presence of the jury, at around 3:45 p.m. on May 19, 1980, the prosecution requested a continuance of the trial to the following morning at approximately 11 a.m. The continuance was sought to await the arrival of a witness, Linda Sanchez, the estranged wife of appellant's brother, who had just been located. Defense counsel immediately objected to a continuance, arguing that the defense had never been informed there was any such witness who might testify. The court granted the prosecution's request for a continuance and made provisions for her to be interviewed by the defense before she testified.

In the instant case the continuance granted amounted to only a few hours.

The decision to adjourn early and/or reconvene late to accommodate a litigant is clearly within the discretion of the trial court. Absent a patent denial of due process, that decision will not be disturbed on appeal.

## VI

Appellant's next contention on appeal is that the trial court had a duty to instruct the jury, *sua sponte*, pursuant to CALJIC No. 4.21, that it could consider appellant's state of intoxication in determining if he were capable of forming the necessary specific intent to inflict great bodily injury upon the victim.

The duty to instruct *sua sponte* on particular defenses arises only if (1) it appears the defendant is relying on such defense, (2) there is substantial evidence supportive thereof, and (3) the defense is not inconsistent with the defendant's theory of the case. (*People v. Sedeno* (1974) 10 Cal.3d 703, 716 [112 Cal.Rptr. 1, 518 P.2d 913].)[5]

Simply stated, the trial court has no duty to instruct the jury, *sua sponte*, on a theory of defense that has been affirmatively abandoned by the defendant as a matter of trial tactics. Where the defense theory is alibi (*People v. Crawford* (1968) 259 Cal.App.2d 874 [66 Cal.Rptr. 527]), or nonparticipation (*People v. Cram* (1970) 12 Cal.App.3d 37 [90 Cal.Rptr. 393]), the defense of diminished capacity to form a specific intent by reason of voluntary intoxication is irrelevant. The duty to instruct *sua sponte* does not arise unless "there is substantial evidence that the defendant is relying upon such a defense." (*People v. St. Martin* (1970) 1 Cal.3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d 390].)

There was no evidence whatsoever that appellant was intoxicated. The fact that a defendant has been drinking, without evidence that he became intoxicated thereby, provides no basis for an instruction on intoxication. (*People v. Spencer* (1963) 60 Cal.2d 64, 87 [31 Cal.Rptr. 782, 383 P.2d 134]; *People v. Mills* (1977) 73 Cal.App.3d 539, 544 [140 Cal.Rptr. 803]; *People v. Cram, supra,* 12 Cal.App.3d 37, 44.)

Appellant in this case cannot fall within any of the requirements indicating when a court is required *sua sponte* to instruct on particular defenses. First, appellant did not rely on the defense of diminished capacity. Second, there was no substantial evidence supportive of this

---

[5]Overruled on other grounds in *People v. Flannel* (1979) 25 Cal.3d 668, 684-685, footnote 12 [160 Cal.Rptr. 84, 603 P.2d 1].

defense. Third, such a defense is totally inconsistent with appellant's theory of the case. In this case, appellant had an alibi defense. Thus, the trial court could not err in failing to give, *sua sponte*, CALJIC No. 4.21 on the effects of voluntary intoxication on a defendant's capacity to form specific intent.

## VII(a)

Appellant next contends that the trial court improperly used the fact of a prior prison term appellant had served for a 1976 conviction of assault with a deadly weapon both for enhancement and in aggravation, thus violating Penal Code section 1170, subdivision (b), and rule 441 of the California Rules of Court, which prohibit the dual use of any fact to both aggravate and enhance a sentence. However, no dual use of facts occurred in the case at bar.

At sentencing, the court in the instant case justified its imposition of the upper term with the following factors: "The aggravating factors for imposing upper terms, including the following: the fact that the defendant's prior convictions are numerous and his criminal conduct is increasing in seriousness, the fact that the defendant was on parole from the state prison, having been released less than four months previous to the commission of the offense, and that the fact that the defendant's performance on probation and parole had been consistently unsatisfactory."

All of these factors were proper circumstances in aggravation to be considered by the trial court in deciding to select the upper term. (Cal. Rules of Court, rule 421(b)(2), (4) and (5).

In addition to receiving the aggravated term in this case, the court enhanced appellant's sentence pursuant to Penal Code section 667.5, because he served a prior *prison term* for his 1976 assault with a deadly weapon conviction.

Appellant contends that the trial court used the appellant's prior convictions to both enhance the sentence, and to aggravate the term. Appellant is in error. "Prior prison terms" is a separate factor of aggravation listed in rule 421(b)(3) of the California Rules of Court. In the probation report, appellant's prior criminal record was summarized. Appellant was convicted of malicious mischief (Pen. Code, § 594) in 1974, obstructing a police officer (Pen. Code, § 148) in 1975, carrying

a loaded firearm (Pen. Code, § 12031, subd. (a)) in 1975, and assault with a deadly weapon and use of a firearm (Pen. Code, §§ 245, subd. (a) and 12022.5) in 1976.[6]

In this case, appellant's sentence was aggravated because he had a pattern of prior convictions which were increasingly serious in nature. Appellant's sentence was then enhanced because he served a prior prison term within the meaning of Penal Code section 667.5. The court never referred to appellant's prior prison term when it aggravated his sentence. The prior prison term that appellant served for his 1976 assault with a deadly weapon conviction was only utilized for the purpose of enhancement. Thus, there was no prohibited dual use of facts in this case.[7]

This case is distinguished from *People* v. *Lawson* (1980) 107 Cal. App.3d 748 [165 Cal.Rptr. 764]. In *Lawson* the trial judge expressly said he was considering the same reasons for selecting the top term (an aggravation) and making other counts run consecutively (an enhancement). By so doing there was a prohibited dual use of facts.

Where the record does not affirmatively indicate that the trial court included an enhancement prior as part of a defendant's criminal convictions under rule 421(b)(2), the reviewing court will not presume that it was so included. (*People* v. *Bejarano* (1981) 114 Cal.App.3d 693 [173 Cal.Rptr. 71].) Thus, appellant's contention of a dual use of facts cannot stand.

## VII(b)

In justification for its imposition of consecutive sentences the trial court in the instant case listed three separate factors: (1) the

---

[6]At sentencing the prosecutor presented to the court his interpretation of the probation officer's recommendation for an aggravated term. He said: "I'm [saying] that's his basis for recommending the aggravated term. This past record *independent* of the prison prior which he suffered—*independent* of that, I think he—one of the considerations that he would mention was his violent history in recommending the aggravated term." (Italics added.)

[7]Compare *People* v. *Jardine* (1981) 116 Cal.App.3d 907, 923-924 [172 Cal.Rptr. 408]. In *Jardine*, the defendant received three 1-year enhancements for three prior felony convictions. In explaining the choice for the upper term, the court specifically referred to the same three prior convictions. The appellate court stated that there was a prohibited dual use of facts, stating "This is not a case in which we can assume that the trial court's reference to the prior convictions did not influence the court's selection of the upper term." (*Id.*, at p. 924.) Hearing was denied in *Jardine* on June 3, 1981.

crimes were committed at different locations; (2) the crimes involved separate acts of violence; and (3) appellant had engaged in a pattern of violent conduct which indicated serious danger to society. Pursuant to California Rules of Court, rule 425(a)(2) and (3), rule 425(b), and rule 421(b)(1), all three factors were proper criteria to be considered by the trial court in deciding to impose consecutive rather than concurrent sentences.

Appellant contends the trial court improperly relied on factors (1) and (2) above because "the crimes were clearly committed in the same location, i.e., a vehicle, and, were in part and parcel of a continuing act of violence."

This contention has been considered and rejected in the discussion of appellant's appeal issue number II, *ante.*

Appellant further contends that the "pattern of violent conduct" factor used as a basis for imposing consecutive sentences was also used as a basis for selecting the upper term. He contends the use of the fact that appellant's prior convictions were numerous *and* of increasing seriousness in aggravating his sentence was "very much related" to the "pattern of violent conduct" factor in imposing consecutive sentences.

A review of the record in this case demonstrates this position is not well taken.

On the night of November 30, 1979, and/or the early morning hours of December 1, 1979, over a three- to four-hour period, appellant engaged in a pattern of violent conduct which indicates a danger to society. The pattern included two separate rapes by force and/or violence and an intervening act of forcible oral copulation with violence. Such a pattern of conduct is more than adequate to support the consecutive sentences meted out in this case.

On the other hand, in making reference to ". . . the fact that the defendant's prior convictions are numerous and his criminal conduct is increasing in seriousness, . . ." the court was necessarily referring to a course of conduct occurring during calendar years 1974 and 1975 when appellant suffered *seriatim* convictions for Penal Code section 594, Penal Code section 148, and Penal Code section 12031, subdivision (a).

Rule 425(b) of the California Rules of Court provides that "Any circumstances in aggravation or mitigation" may be used as criteria

affecting the decision to impose consecutive sentences. Engaging in a "pattern of violent conduct" and prior convictions which are "numerous" *or* of "increasing seriousness" are separate factors in aggravation pursuant to rule 421. Appellant's prior convictions in the instant case were numerous. Thus, he had his sentence aggravated. In addition, as a factor in imposing consecutive sentences, the court found he had engaged in a pattern of violent conduct which indicated he was a serious danger to society. This court finds there was no prohibited dual use of facts.

## VII(c)

Appellant further contends that "the trial court clearly did not exercise any independent discretion, but adopted the recommendation of the probation officer upon the urging of the district attorney."

Frequently throughout the sentencing hearing the court sought the views of the district attorney, the probation officer, and defense counsel. At one point the trial court asked the deputy district attorney to give his interpretation of page 12 of the probation report. The deputy district attorney proceeded to give his interpretation of the recommendation in the probation report. Additionally, the representative from the probation office explained his department's policies.

The court then asked the district attorney to "pronounce judgment." Defense counsel objected to that procedure. The court stated it was adopting the recommendation of the probation officer. The district attorney informed the trial court that it must state for the record his reasons for adopting the aggravated term and for adopting consecutive as opposed to concurrent sentences. The court then stated for the record its reasons for the sentencing choices made.

Appellant contends the practices as described above constituted a "blatant abuse of discretion."

In the final analysis sentencing determination is a matter of judgment for the court and not for the probation officer. However, the primary function served by the probation report is to assist the court in determining an appropriate disposition after conviction. (*People v. Warner* (1978) 20 Cal.3d 678, 683 [143 Cal.Rptr. 885, 574 P.2d 1237].) The probation report did assist the court in this case. Indeed, the court was careful to make sure it thoroughly understood the recommendation. It

has been stated that the court does not abuse its discretion in following the probation officer's recommendation provided the recommendation is supported by the record. (*Id.*, at pp. 683-684, fn. 3.)

 In the exercise of its discretion the trial court decided to follow the probation officer's recommendation, a recommendation which was supported by the record. The trial court did state on the record its reasons for selecting the upper term and for imposing consecutive sentences as it was required to do. Absent a clear showing of abuse, the trial court's discretion in sentencing should not be disturbed on appeal. "Discretion is abused when the court exceeds the bounds of reason, all of the circumstances being considered." (*People* v. *Bradford* (1976) 17 Cal.3d 8, 20 [130 Cal.Rptr. 129, 549 P.2d 1225].) Considering all of the circumstances in the instant case, there is no indication that the trial court failed to exercise its discretion in sentencing appellant.

The judgment is affirmed.

Zenovich, Acting P. J., and Hanson (P. D.), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 14, 1982.